**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Nov 07 2013, 5:32 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**ADAM C. SQUILLER**
Squiller & Hardy
Auburn, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**JAMES B. MARTIN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| MICHAEL P. STAFFORD, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 17A04-1304-CR-178 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE DEKALB SUPERIOR COURT
The Honorable Monte L. Brown, Judge
Cause No. 17D02-1203-FA-2

**November 7, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**SULLIVAN, Senior Judge**

Michael Stafford was sentenced to an aggregate term of 120 years following his jury convictions for Class A felony criminal deviate conduct, Class A felony kidnapping, Class B felony burglary, Class B felony criminal confinement, and Class B felony robbery while armed with a deadly weapon. He now appeals, arguing his convictions for kidnapping, burglary, confinement, and robbery should be vacated pursuant to the continuing crime doctrine. Alternatively, he argues his sentence is inappropriate. We conclude that the continuing crime doctrine does not apply and that his sentence is not inappropriate, and we therefore affirm in all respects.

On July 21, 2009, B.G. was mowing the lawn of her two-acre country home in DeKalb County when a man, later identified as Stafford, pulled into her driveway and asked about two cars that were displayed for sale. B.G. gave Stafford some details but said he would need to talk with her husband. When Stafford asked if her husband was home, B.G. told him no but offered to give him his cell phone number. Stafford said he did not have a pen. B.G. said she would write down the number for him, ran into the house, and scribbled on a piece of paper.

When she turned around, Stafford was in the doorway holding a knife up near his chin. He asked if anyone else was in the house. B.G. told him her two-and-a-half-year-old daughter E.G. was in the garage. Stafford said they had to go get her, so they went onto the porch and B.G. called E.G.'s name. E.G. started crying as soon as she saw them and would not come. Stafford led B.G. down the steps and into the garage with the knife at her neck, B.G. picked up E.G., and Stafford asked for another way back into the house. B.G. took Stafford to a door in the garage, and Stafford, with the knife still in hand,

2

ordered her to open it. As they walked through the laundry room, B.G. offered Stafford money, but he said he would get it himself.

Once they reached the living room, Stafford duct taped B.G. and E.G. together at their waists. He also taped B.G.'s wrists together. He then started taking his pants off and told B.G. he was going to rape her. B.G. started screaming. Stafford got on top of her, covered her mouth with his right hand, stuck the knife to her throat with his left hand, and said, "You need to shut up or I'm going to hurt her." Tr. p. 242. The duct tape was loose, and B.G. was able to pull his hand off her mouth so she could breathe.

Stafford took them to the master bedroom, and B.G. put E.G. on the bed. Stafford forced B.G. to take off her shirt and bra and then ordered her to get on the floor. Stafford stood against the nightstand and ordered B.G. to perform oral sex on him. She complied, and Stafford ejaculated into her mouth. When he was done, he called B.G. a whore and allowed her to put her clothes back on. E.G. was crying on the bed the entire time.

Stafford took B.G.'s cell phone and home phone. He then made B.G. and E.G. get into the bathroom, barricaded the door with a chair, and told B.G. to count to one hundred before getting out. He warned her not to tell her husband or the police because he knew where she lived. Once B.G. heard Stafford drive away, she got out of the bathroom and ran across the street with E.G. to her neighbor's house. Her neighbor called 911.

Three months later, B.G. spotted Stafford while she was out shopping with E.G. She called the detective on her case, but the police did not arrive until after Stafford had left. In March 2012, over two and a half years after the crimes, B.G. was out having

3

dinner with her family when she spotted him again. She called the police. The police arrived and identified him, and he was arrested later that month.

The State charged Stafford with Class A felony criminal deviate conduct (B.G.), Class A felony kidnapping (E.G.), Class B felony burglary, Class B felony criminal confinement (B.G.), and Class B felony robbery (B.G.). While housed at the DeKalb County Jail, Stafford asked fellow inmate Jeremy Coleman to kill B.G. to prevent her from testifying against him. He gave Coleman B.G.'s name and address. He also provided Coleman with his own address, where Coleman was to obtain a gun and take cash, a truck, and a motorcycle as payment.

Stafford was tried before a jury. He was found guilty on all counts. At the sentencing hearing, the trial court made a detailed and thorough sentencing statement finding several aggravating and no mitigating circumstances. The court sentenced him to forty-five years each for criminal deviate conduct and kidnapping and fifteen years each for burglary, confinement, and robbery. All sentences were to be served consecutively except for confinement, which was to be served concurrently with the other sentences, for an aggregate term of 120 years.

Stafford raises two issues on appeal: (1) whether his kidnapping, burglary, confinement, and robbery convictions violate the continuing crime doctrine, and (2) whether his sentence is inappropriate.

## I. CONTINUING CRIME DOCTRINE

We have described the continuing crime doctrine as a "category of Indiana's prohibition against double jeopardy." Walker v. State, 932 N.E.2d 733, 736 (Ind. Ct.

App. 2010). "The continuing crime doctrine essentially provides that actions that are sufficient in themselves to constitute separate criminal offenses may be so compressed in terms of time, place, singleness of purpose, and continuity of action as to constitute a single transaction." Id. at 735. This doctrine does not seek to reconcile the double jeopardy implications of two distinct chargeable crimes; rather, it defines those instances where a defendant's conduct amounts only to a single chargeable crime. Boyd v. State, 766 N.E.2d 396, 400 (Ind. Ct. App. 2002). The continuing crime doctrine thus prohibits multiple convictions for the same continuous offense. See id.

Stafford contends that his kidnapping, burglary, confinement, and robbery convictions violate the continuing crime doctrine because those offenses occurred merely to facilitate his crime of criminal deviate conduct. Stafford is incorrect. Although the crimes occurred in the same period of time, each offense was a distinct chargeable crime arising from a separate criminal act. See Walker, 932 N.E.2d at 737 (continuing crime doctrine "does not apply to factual situations where a defendant is charged with two or more distinct chargeable crimes" but may apply where defendant is charged multiple times with one offense or where defendant is charged with an offense and a lesser included offense).

Specifically, burglarizing the house, kidnapping E.G. to use her as a hostage, confining B.G., forcing B.G. to perform oral sex on him, and robbing B.G. of the phones were all separate criminal transgressions. The continuing crime doctrine simply does not apply. See id. at 738 (continuing crime doctrine not applicable—although burglary, robbery, and confinement occurred in same series of events, each was distinct chargeable

5

crime); Firestone v. State, 838 N.E.2d 468, 472 (Ind. Ct. App. 2005) (continuing crime doctrine not applicable—although criminal deviate conduct occurred right after rape, "[t]he continuity of the actions does not negate the fact that they were completely different sexual acts committed at different times").

## II. INAPPROPRIATE SENTENCE

Stafford next contends that his sentence is inappropriate. Although a trial court may have acted within its lawful discretion in imposing a sentence, Article 7, Sections 4 and 6 of the Indiana Constitution authorize independent appellate review and revision of sentences through Indiana Appellate Rule 7(B), which provides that a court "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Reid v. State, 876 N.E.2d 1114, 1116 (Ind. 2007) (citing Anglemyer v. State, 868 N.E.2d 482, 491 (Ind. 2007), clarified on reh'g, 875 N.E.2d 218 (2007)). The defendant has the burden of persuading us that his sentence is inappropriate. Id.

We first look to the statutory ranges established for the classes of the offenses. Stafford was convicted of two Class A felonies and three Class B felonies. The statutory range for a Class A felony is between twenty and fifty years, with the advisory sentence being thirty years. Ind. Code § 35-50-2-4 (2005). The statutory range for a Class B felony is between six and twenty years, with the advisory sentence being ten years. Ind. Code § 35-50-2-5 (2005). Stafford was sentenced to forty-five years on each Class A

6

felony and fifteen years on each Class B felony, with all but one Class B felony to be served consecutively, for an aggregate term of 120 years.

We next look to the nature of the offenses and Stafford's character. As to the nature of the offenses, Stafford pretended to be interested in the cars for sale but then invaded the home and took B.G. and her toddler daughter E.G. as his victims at knifepoint. He ordered them to the floor, told B.G. to "[s]hut the fuck up" when she attempted to recite the Lord's Prayer, Tr. p. 245, tied them together, and said he was going to rape B.G. When B.G. started screaming, Stafford got on top of her, obstructed her breathing, stuck the knife to her throat, and threatened to hurt E.G. He then moved them into a bedroom, ordered B.G. to remove her shirt and bra, and forced B.G. to perform oral sex on him while E.G. sat crying on the bed. He ejaculated into B.G.'s mouth and called her a whore. Before leaving, Stafford took all the phones, barricaded them in a bathroom, and told B.G. to keep quiet because he knew where she lived. Stafford's callous actions do not warrant any revision to his sentence.

He nonetheless argues that his character as reflected in his criminal history is somehow redeeming. While Stafford does not have a lengthy criminal history, neither is it insignificant. He has a 1998 conviction for burglary stemming from an incident in which he broke into a residence and stole cash and property. While the crime occurred about a decade before his current offenses, it is still notable that, like the crimes here, it involved burglary. Moreover, he has a conviction for operating a vehicle with an alcohol concentration equivalent to 0.15 or more for an incident occurring just a year after he victimized B.G. and E.G., and he failed to comply with the terms of his probation in that

7

cause. Most revealing about Stafford's character, however, is the fact that he tried to recruit a fellow jail inmate to put B.G. "6ft under!" so she could not testify against him. State's Sentencing Ex. 4; see Tr. p. 539. He gave Coleman B.G.'s name and address, told him where to get a gun, and offered him cash, his truck, and his Harley-Davidson as payment for B.G.'s silence.

Stafford has failed to persuade us that his sentence is inappropriate.

Affirmed.

BAKER, J., and BROWN, J., concur.